Good morning, Your Honor. May it please the Court. I'm here to argue on behalf of Myas Asatryan in this petition for review on the denial of an application for withholding of removal and for asylum. Counsel, I'm sorry, I didn't hear your name. Eric Anderson, I'm sorry, as amicus on behalf of Myas Asatryan. Now, in our brief, we covered a lot of ground, but for purposes of today's argument, I'd like to focus primarily on the withholding of removal. In this case, what we're looking at here is a question about persecution, and there are some adverse credibility findings that were made by the I.J. In our brief, we point out some problems with the way that the I.A. approached this case, but ultimately, we don't think that really matters because when you boil it down to the credibility determinations that the I.J. made, they're unsustainable. There are three pieces to that, and I think I'd like to hit each one of them in order. The first part of that is there was a discrepancy in the testimony initially about the date that Mr. Asatryan moved from one part of Armenia to another part. In his application for asylum, he said 1991. He moved to the city of Ekimiazon. In his initial testimony, he said 1993, but then he corrected it and went back to 1991 when he realized that he made an error there. And I think it's important to keep in mind that Mr. Asatryan was speaking through a translator, and that if you look at the transcript as a whole, there's a lot of indications that there were some issues in terms of trying to communicate effectively. And so as soon as he was aware of that error, he fixed it. It's a small one. Case law on the circuit is clear that if this doesn't go to a core issue in the case, it really shouldn't be held against him. Counsel, what's really bothering me about this case is that even today, your client relies on activities that occurred between 1991 and 1995, mostly 1995. Yet he was in this country in 1997, went back to his home country, never said a word. Now, after, you know, many years, well, less than 10 years in this case, after all of this, he's bringing all of this up. This just doesn't make sense to me. Well, and I think we could ‑‑ I think that he addressed that in the IJ, in his testimony in front of the IJ. I think one of the important things that we have to keep in mind is that, you know, particularly in light of the news that a number of the members of the Gambino family were arrested just yesterday, that there are countries in this ‑‑ you know, there are countries in this world, like Armenia, where the Gambinos aren't criminals trying to hide, they're running the country. You know, what's interesting is I think that the overlap between our case and the case before us was that this Mr. Gregorian, who's now the Deputy Defense Minister, plays a central role in all of this. Was the Deputy Defense Minister's status in the record someplace? I believe that it was mentioned in the record, at least within his testimony about it. In this case? In this case. In this case. And what you see here is that Mr. Sotrin isn't claiming to be a saint. He's not claiming to be Sam Adams. But he was involved in politics up until 1995, when he was beat. He was tortured. He spent six days in jail. And it was done all at the instruction of Mr. Sotrin. Then he comes over to this country. That's true. But doesn't file an asylum application until after he goes back to Armenia, and then comes back to this country. But as he explains his actions, and I think that this has to be kept against the backdrop of the breakup of the Soviet republics, his country is finding independence. There are changes in place in this politics. And so he goes, he comes here in 1997, and at the administrative record at 98, when he's asked, why did you go back? He says, well, I have this new country. You know, we're trying to give things a change. And one of the things that he was told when he was beat and tortured was that the one thing that you shouldn't do is get back into politics. And from 1995 until 1999, he doesn't. He keeps his nose clean. He keeps himself to the ground. And he's trying to see change in his country. And he starts to think that he's seeing it. The record shows that in 1998, the original president stepped down, that there are, you know, there are these movements afoot in parliament to have change. And then all of a sudden, you know, and he starts working on behalf of one of these politicians who represents the immigrants union, which I think is one of the things that we have to address in terms of the credibility findings. And working for this Sarkisian candidate, he puts himself back out there again. Now he's vulnerable four years, five years after the initial actions. And he's there, and he witnesses his candidate being told to get out of the process. He then finds his candidate loses by fraud. The candidate then disappears, and we have reports that that's not the widespread phenomenon in Armenia during this timeframe. And all of a sudden, he's, you know, he's finding that Mr. Sarkisian's family members are coming to him and asking him to write this letter. And he doesn't want to do it. He doesn't want to do it. He doesn't want to put his head up. But recognizing that he is coming to America, recognizing that he's worried about what's going to happen to him, he signs off on it right before he leaves. Is it the bravest thing to do? People can debate about that. Is it prudent to leave once you put your name on a letter that accuses the deputy defense minister of involvement in torture and murders? One could see why he might not want to go back. And the record confirms that, because his wife, who is still there, receives the visit from your KRAPA officials, beating her up, threatening him if he comes back, and establishing both that his persecution in the past is now an element of the threat of persecution today. And there's nothing in the record that contradicts that. The judge asked him about it. He gave an explanation. It was consistent. I don't understand this about the wife. The wife gets beaten, right? Yes. And how is this attributable to him? Because the government comes to visit her looking for him. And what they say is, is he here? They beat her. And they say, if he comes back, I believe the reference is to a bullet in the head. And then she leaves the country and goes to Russia, which makes a lot of sense from her perspective as well. And, you know, in terms of what the credibility finds that the I.J. did make, the one thing that he didn't do Well, I'm talking about the beating of her. Right. They beat her then when they come looking for him? They do. I believe that's what the record reports. And the theory here is that they beat her to get at him? Or is it because of her independent political activities or what? Oh, it's because of the letter that he signed. After he signed the letter, it was sent off to government ministers. And that they then, the I.J. or some subset of that, goes looking for him, sees his wife, says, where is he? She doesn't say. She's beat. And then leaves the country. And they leave one last threat for him. He has parents there? Hmm? He has parents there? He does. And they don't threaten or beat or harass the parents? Well, and, you know, we cite this in our brief. But the case law in this circuit, and I think it applies here in these facts as well, is that family members only count if they're similarly situated. His wife counts because she's affiliated with him and he's the one who's engaged in the political activities. But, see, this is why I asked you this question about the beating of the wife and how that works. And what you told me is they come looking for him and they beat her to get at him. Are you saying now something else? Like she's involved with his political activities? No. You signed the letter? I mean, how is the wife really different than the father or the mother? I mean, I would think that if you just want to sort of hurt him, I mean, I, you know, I would think that beating a mother or father would be somewhat on a par with beating a spouse. I don't want to make judgments of other people's families, but that's sort of a ‑‑ I think the perspective to look at this is through the purpose of what the visit is. And the purpose of the visit is to find him. Right. So going through his father and mother, who he hasn't been with for a long time, one can understand why, you know, Manuel Gregorian or others didn't go there. They went with his wife. But they figure out when he's not there that he's not there. The wife says, you know, he's gone, he's out of the country. Right. And at that point, what's the point of beating her? I mean, I, you know, you were just as well beaten from mother or father. If the point is saying, look, he'd rather return or whether come back and beat you again and again and again unless he comes back and gives us ‑‑ I understand that rationale. But you could do that just as well with mother and father. You don't need to have a spouse. And there's two things there. One is the record is unclear as to exactly how this went down. Did they beat her first and then she told him where it was? Well, maybe it's unclear because it's not true. Well, I mean, I ‑‑ Under GUO, you know, under this Court's own thing, under its own precedence, under GUO, if there was a problem there, if the IG thought that was a problem, there was a time to ask. That's not what he asked about. The only things he asked about were 1991 through 1993. Well, the IG found him ‑‑ I'm sorry, the IG found him not credible, right? Right. On three grounds. And reluctantly found him not credible. The one was this minor ground about the date of the movement. I love it when they add the reluctantly. That sort of gives us real confidence. Right. But it does show the narrow nature of the situation. You know, your time is running, and I want to get in one last question. Your argument here picks up on one of the possible arguments in your brief. It doesn't pick up on another argument that's in your brief, and that is did the BIA, in affirming the decision of the IJ, actually affirm the adverse credibility finding? I'll address this partly when the government is in front of us, but I frankly find the BIA order something far less than a clear affirmation of the adverse credibility finding of the IJ. I find the BIA's order gibberish. They say, assuming that he's telling the truth, da, da, da, da, they say why this does not constitute persecution, and then they say we agree with the IJ without mentioning one word about adverse credibility. I'm inclined, now I'm speaking only for myself and only my own inclination, I've certainly not consulted with my colleagues at this point, to send it back to the BIA and ask them, okay, would you please tell us what you actually have decided? Because I can't tell. And we agree on it. We pointed that out as a problem. I think ultimately that doesn't matter because the three grounds that were cited for the credibility are unsupported by the record and by this Court's own authorities. But if it was going to be remanded back down because it is incomprehensible and because they don't ever address any of the arguments that were made in the brief addresses the BIA, I think that that would be a fallback position from our point. But deep down, you know, our position is simply that all three bases, there are no discrepancies in the record. Are you saying we can't assume or at least accept the BIA's conclusion? Granted, it's a little confusing. But assuming that the BIA was saying that we assume that the petitioner was credible, can't the BIA then credit the substantive issues and review the determination on past persecution? It could if it had done that in the alternative. And I recognize I'm over time, so I don't want to go too long. But if they had done that in the alternative and they had explained how they got there. You know, we think that as a matter of law, they're wrong about under the Mimouzian case, for instance, about whether or not these facts, assuming they're true, amounts of persecution. They do. But what the BIA does is, you know, I mean, it is incomprehensible from a logical point of view. They don't say in the alternative if we were to assume it was credible. They say it is credible. And then they affirm for the reasons that the IJ gave, which are that it wasn't credible. It turns out that we think that the focus of this is that the IJ reasoning itself doesn't stand up to scrutiny. So the three pieces that were there, there was a reference in the application to a group. He explained it was the immigration union. There was, he explained the 1991 through 1993. And he has an understandable explanation for why it was that he went back in 1997 and why he then left in 2000, because the things that he had done in 1995 were coming back to haunt him, unless there's any more questions. Thank you, Your Honor. Mr. Court, please. I'll turn first to the issue that Judge Flesher raised, but I don't want to spend my whole time on that. The board's decision was not too artistic. I still think it was clear enough. It puts the cart before the horse, because what it's the bottom line should have come earlier. It very clearly said that we, because we agree with the immigration judge, we affirm for the reasons that he gave. Now, if they had done that, then the second thing is they're saying, assuming, assuming. Now, assuming doesn't mean they find that he's credible. They simply said, assuming that he is, assuming arguendo, or even if he is, nevertheless, he can make a case. Can I go through? I kind of adumbrated my position, but I now want to make it clear why I think this BIA order is gibberish and why, given my own preferences, I don't know yet my colleagues, I would simply send it back so they could tell us more clearly what they mean. I look at the citations that they give us in the order. You've probably looked them up. The first citation is to a statutory section. That statutory section is 8 U.S.C. 1158 A to capital B. That's the one-year bar, which is not implicated in this case whatsoever. They then cite Cardozo-Fonseca and INS v. Stevak, which differentiates between the standard for asylum and withholding of removal. The BIA then cites Zeng v. Ashcroft, which is the definition of acquiescence in a CAT claim, which is not at issue in this case. They then cite matter of SV, which is, again, acquiescence in a CAT case, which is partially overruled in Zeng, again, not at issue in this case. Then they say, assuming credibility, hasn't demonstrated. And then the only thing that can possibly support their conclusion that they affirm on the basis of adverse credibility finding, after all of this, based on the BIA rights, inasmuch as we are in agreement with the immigration judge's decision, we affirm his decision based upon and for the reasons set forth therein. That sure sounds like boilerplate to me. I wonder, given the citations that are totally irrelevant to the case in front of us, whether they even think they're affirming a different case. I mean, I just can't tell. Well, I would suggest, Your Honor, that, nevertheless, the last sentence that you read, we affirm for the reasons given by the I.J. and the only reason the I.J. gave was lack of credibility. I suggest that this is an adoption of the I.J.'s adverse credibility determination. Now, as I said, it could have been written better. I certainly would have written it differently. If it had gone the other way, there would have been no question if that last sentence came first and then they said, assuming. But that sentence had been written first and then nothing else. I'm entirely with you. This is also true. But I still maintain that what the board did affirm was the I.J.'s decision for the reasons that he gave and the reasons that he gave were lack of credibility. Now, I'd like to turn now to the credibility question, if I may. All of the statements that counsel made as if they were established facts are not. They were merely the assertions made by Petitioner in court. And the question at issue is, the question at issue before the I.J. was, were these truthful assertions? And the question at issue before this Court is, is the indices that they are truthful so compelling that the I.J. was forced to have accepted them as true? And I will start with something here, that one way that you can show the indices of truthfulness is if the Petitioner's or the applicant's story accords with what is generally known as, for example, I always give the example, if you had back in the 1990s, of what happened on Crystal Lock, this is what happened to me, because everyone knew what happened at Crystal Lock, and therefore, that was pretty strong evidence that when he said it happened to him, it was the truth. Or the other thing is, where it accords with what is the truth. I mean, what I'm saying is when I commit as a judge... Kennedy. No, what I'm saying is when I commit... But you could say you could pick up on all these reports, and for all we know, this person was... Well, let's pretend he was more than negative. Visiting France at the time. Well, I'm going to... That's true. So I don't know... Oh, I see your point, Your Honor. The first thing is, is there affirmative evidence of what he's telling us the truth? If there is, then is there anything... And this would be contradictions within the testimony itself, which sort of knocks down the... But you know that's what you'd be arguing. You know, you're saying, well, you know, all he's saying is he's published reports. Everybody knows him. We can all decide what happened with Stalmach. And we were there, you know, and I wasn't even born then. But what I'm about to offer... And that's what the U.S. government would be arguing. Look, what I'm about to offer is this. He tells a story of prejudice against the Armenians from the diaspora coming back to Armenia. He tells a story of a group, I think it's called the Yatsberak, or something like that, which was supposedly veterans of the Karabakh campaign. And let's see, I had a couple of other things that he has in there. And the thing is that if you read the, which is in the record, the State Department report, which he himself introduced, which gives a pretty clear story of those who are suffering prejudice in Armenia. One of them, as I recall, was a group apparently were Kurdish-related people. There is nothing in the report which indicates at all that Armenians from the diaspora are treated differently in Armenia. There is nothing in the report which indicates that they have their own organization. There was nothing in the report which even mentions this Yatsberak organization or indicates that these people were a force, sort of a negative force, you might say, a brutal force, but a force in Armenian public life. And I suggest to you that with that lacking, there is a very clear lack of compulsion to his story. Then you get to the contradictions, the one which Judge O'Sullivan has pointed out. I think I mispronounced your name. I apologize if I did. The one that you pointed out, he says, these things happened to me in 95. He comes over here in 97 and goes back. And what's his excuse? Well, Armenia is a new country. Well, if it was a new country in 97, it was still a new country in 99. There had already been change because, again, it's the ANM, the Armenian National Movement, I think it is, that he is saying is the cause of all this. They are the ones that the so-called Yatsberak are associated with. And by 99, the ANM has dissolved. He supports his candidate. He says. He does say that. I mean, we are on the part of the argument. I mean, if you want to argue lack of credibility, you're still arguing lack of credibility, right? That's exactly it. What I'm saying is that there is every reason. But there's no internal inconsistency. You have to sort of accept the story in order to figure out whether there's an internal inconsistency. You say, oh, it's inconsistent to say in 95 it's a new country. It's not a new country in 99. There's an inconsistency there. But what he says is, look, more stuff's happened in 99. And what happened then is I signed on to this candidate who supposedly lost the election, claimed vote of fraud, and disappeared. But he wasn't mistreated. He was mistreated in 95. According to him. He doesn't even claim that he was personally mistreated, that he was taken held in jail or was beaten or anything in 99. So, yes, it is possible that he is telling the truth there. But, again, the man in the street can listen to that and say, well, maybe so, but I have my doubts. And all that is necessary, since he has the burden of establishing the truth of his story, is that there be a reasonable or rational basis for doubts. And I suggest that for the reasons that I already gave, again, for this not applying right after he would have been beaten. Okay. Thank you. I think you're over your time. Would you like a minute for rebuttal? I'll make it up. I want it to be one minute. Okay. We have just a couple quick points of disagreement with the government's position. The first is that a credibility finding in the circuit is the beginning of the analysis, not the end. The fact is he provided a bunch of contextual evidence that put his testimony into a credible, plausible situation. Even if you believe his story, that's what he's saying about the persecution. I mean, we have cases that say one beating is not enough. And that's really all he has, is one beating. Well, we have the case of the... And it wasn't, you know, he didn't have broken bones or fractured skull. Was he hospitalized on the beating? I believe he was not hospitalized. His wife was. He seemed to have a home tent. But I do think that the cases that make this distinction clearest, I think, where we fall on the right side of the line, are the two Prasad cases we cited in our briefs. In the first Prasad case, you have somebody who has one minor beating, his kid a couple of times, and kicked, and that's it. In the Prasad 2 case, you have much more graphic violence. You have sustained detentions. You have continuing threats. The only thing that's different in Prasad 2 is that you have multiple detentions, and here you only have one. But the fact is that against this context of if he had applied in 1997, I think it would be a slam dunk that he would have gotten it for persecution at that point in time. I have a quick question. In the rising out of your co-counsel's brief, you are amicus counsel, as I understand it. That's right. Retained counsel has filed a brief, and as makes the statement on page 6, the BIA assumed that Petitioner was credible but concluded he had not passed persecution or well-founded fear of persecution. To what extent are you bound by the statement made by your co-counsel? Well, I think that that's true in the sense that we think that the BIA did assume credibility at the same time that it may have not assumed it. And if they made that finding, that finding is unsupported by this record because the triggering of that, his leaving, the thing that puts him in both fear of the persecution that has continued forward and the well-founded fear of persecution in the future is his involvement in this campaign, his complaining about what Manuel Gregorian did in beating him in 95 and in the disappearance of this candidate in 99. And the fact that you have this violence against his wife and the threat against him, we're not talking about a situation where he's, you know, had one little run-in, you know, with forces outside of his control, moved away, and everything was fine. So you're endorsing your co-counsel's argument, but you're also making the credibility issue. That's right. That was raised by the government. Thank you. Thank you. This argument was then submitted. Our next argument on the last case on the calendar, which is Morgan v. Wilson.
judges: Kozinski, O'scannlain, W. Fletcher